Minute Order Form   (rev. 12/90)

# UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

| Name of Assigned Judge or Magistrate Judge | ROBERT W. GETTLEMAN | Sitting Judge if Other Than Assigned Judge | |
|---|---|---|---|
| Case Number | 00 C 7740 | Date | July 25, 2001 |
| Case Title | Double Sunrise   v   Morrison Management | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd-party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [use listing in "MOTION" box above]
(2) ☐ Brief in support of motion due _____
(3) ☐ Answer brief to motion due _____ Reply to answer brief due _____
(4) ☐ Ruling/Hearing on _____ set for _____ at _____
(5) ☐ Status hearing ☐ held ☐ continued to ☐ set for ☐ re-set for 1/15/02 at 9:00
(6) ☐ Pretrial conf. ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____
(7) ☐ Trial ☐ Set for ☐ re-set for _____ at _____
(8) ☐ ☐ Bench Trial ☐ Jury Trial ☐ Hearing held and continued to _____ at _____
(9) ☐ This case is dismissed ☐ without ☐ with prejudice and without costs ☐ by agreement ☐ pursuant to
   ☐ FRCP 4(j) (failure to serve) ☐ General Rule 21 (want of prosecution) ☐ FRCP 41(a)(1) ☐ FRCP 41(a)(2)
(10) ■ [Other docket entry] Memorandum opinion and order entered. Defendant's motion to stay the instant proceedings and compel arbitration is granted. Defendant's 12(b)(1) motion to dismiss is denied.

(11) ■ [For further detail see ☐ order on the reverse of ■ order attached to the original minute order form.]

| | No notices required, advised in open court. | | | number of notices | |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ■ | Notices mailed by judge's staff. | | FILED FOR DOCKETING 7/27/01 | date docketed | Document # |
| | Notified counsel by telephone. | | | | |
| | Docketing to mail notices. | | 01 JUL 25 PM 4:48  EB | docketing dpty. initials | 13 |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate Judge. | | | date mailed notice | |
| | courtroom deputy's Initials | Date/time received in central Clerk's Office | | mailing dpty. initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOUBLE SUNRISE, INC., a Delaware )
corporation, p/k/a Spectra Serivces, Inc., and )
JAMES HEMPHILL, individually, )
)
Plaintiffs, )
) No. 00 C 7740
v. )
) Judge Robert W. Gettleman
MORRISON MANAGEMENT SPECIALIST, )
INC., a Georgia corporation, p/k/a Morrison )
Health Care, Inc., )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Double Sunrise, Inc. ("Double Sunrise"), previously known as Spectra Services, Inc. ("Spectra"), and James Hemphill ("Hemphill"), have filed a three-count complaint against defendant Morrison Management Specialists, Inc. ("MMS"), p/k/a Morrison Health Care, Inc. All three of plaintiff's claims allege a breach of the implied covenant of good faith and fair dealing under the laws of the State of Illinois.

Defendant has moved to dismiss plaintiffs' complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure or, in the alternative, to stay the proceedings and compel arbitration based on the dispute resolution clauses in the written agreements on which plaintiffs' claims rely. For the reasons set forth below, defendant's motion to compel arbitration and stay the proceedings is granted, but the motion to dismiss is denied.

## FACTS

Until March 1998, Hemphill was president of Spectra, a business that outsourced food and dining services to hospital operators in several states. As president of Spectra, Hemphill conducted virtually all of the company's sales functions. Sometime prior to March 1998, defendant, a national corporation that is also engaged in providing healthcare markets with food and dining services, approached Spectra to discuss the possibility of purchasing Spectra's assets. After extensive negotiations in March 1998, defendant and Spectra entered into an Asset Purchase Agreement ("the Asset Agreement") for $1.1 million ("the purchase price"). The Asset Agreement incorporates an Earnout Agreement ("the Earnout Agreement"), which sets forth a formula whereby Spectra could receive additional funds if the performance of the business were to yield gains to defendant beyond the purchase.[1] In exchange, Hemphill agreed to become defendant's regional vice president in the Chicago area. Accordingly, Hemphill and defendant entered into an Employment Agreement ("the Employment Agreement"), which contains an option (determined by the same formula used to calculate Spectra's earnout payment) whereby Hemphill could receive a yearly performance bonus.[2] Like the Earnout Agreement, the Employment Agreement is incorporated into the Asset Agreement.

The Asset Agreement provides that all three agreements constitute the entirety of the parties' contractual obligations. Section 12.7 of the Asset Agreement states that it "supercedes all prior agreements with the parties with respect to its subject matter... and constitutes (along

---

[1] The formula was based on year-to-year profit growth of the Spectra accounts, the year-to-year profit growth of certain of defendant's accounts that were transferred into Hemphill's region for his management, and the net income realized from new accounts in Hemphill's region.

[2] Hemphill's bonus payment, if earned, would be approximately one-third of the payment to Spectra each fiscal year.

with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement." In the event of a dispute under the agreements, the Asset Agreement provides the remedies available to the parties. "Dispute" is defined in Section 11.1 of the Asset Agreement as "any dispute or disagreement between the Buyer and the Company concerning the interpretation of this Agreement, the validity of this Agreement, any breach or alleged breach by any party under this Agreement or any other matter relating in any way to this Agreement." Further, Section 11.2 of the Asset Agreement states that if the parties' "dispute is not resolved by negotiation," they "shall submit the dispute to binding arbitration."

The Earnout Agreement has a dispute resolution provision in Section 2, which states that "if the parties disagree to the amount, any undisputed amounts shall be paid to the Company, at the option of the Buyer, in either cash or common stock of the Buyer valued at the Stock Price and the dispute shall be subject to resolution as set forth in the Asset Agreement." Section 6 of the Employment Agreement, titled "Settlement of Disputes," also incorporates the Asset Agreement's dispute resolution clause. Section 6 states that "any dispute under this Agreement relating to the amount of the Bonus shall be subject to resolution as set forth in Article 11 of the [Asset] Agreement, which for such purpose is hereby incorporated herein by reference."

Hemphill began working with defendant on March 1, 1998. Pursuant to the Employment Agreement, defendant gave Hemphill various responsibilities including sales, strategic planning, training, and client management. In addition to Hemphill's position, defendant's corporate structure called for sales representatives, commonly referred to as Directors of Business Development ("DBD"). DBD's were to acquire new business and expand existing accounts. During the course of the parties' negotiations for the sale of Spectra's assets, defendant agreed to

provide Hemphill with a DBD who would assist in expanding business in Hemphill's region. Accordingly, when Hemphill began his employment with defendant, a DBD was assigned to his region. Within the first two months that Hemphill worked for defendant, however, the DBD in Hemphill's region was promoted to Hemphill's title in another region, leaving Hemphill without a DBD. Defendant notified Hemphill it would find a replacement DBD as soon as possible, and commenced interviewing potential candidates. From June 1998, until February 1999, the DBD position in Hemphill's region remained unfilled while defendant interviewed candidates. During this time, Hemphill expressed his concern to defendant that the lack of a DBD was seriously impeding his ability to retain new accounts and increase net income in his region.

In February 1999, defendant hired Larry Estes ("Estes") for the DBD position in Hemphill's region. Hemphill advised defendant's senior management against hiring Estes and expressed concern about Estes' lack of experience in the industry. Taking Estes' level of experience into account, defendant offered to extend the Earnout Agreement for another 18 months while Estes familiarized himself with the industry. Hemphill declined the extension however, because defendant also refused to extend Section 4 of the Employment Agreement, the liquidated damages provision. Estes began working for defendant in April 1999. As a result, at the end of the first fiscal year (ending May 31, 1999), the earnout and bonus payments to Spectra and Hemphill were one-tenth the amount originally projected.

From April 1999 until September 1999, Estes failed to establish any new hospital accounts. Around September 1999, Hemphill learned he has cancer and took leave from his duties for a substantial period of time. Hemphill's supervisor, Richard Roberson, assumed the lead role in Hemphill's region while he recovered from surgery. Just prior to Hemphill's medical

leave, Detroit Medical Center ("DMC"), a healthcare operator in Hemphill's region, decided to enter into a contract agreement with defendant. In Hemphill's absence, defendant and DMC revised their contract terms, despite Hemphill's warnings to defendant against doing so. The contract revisions turned out to be unfavorable to defendant and, in January 2000, Hemphill wrote to defendant's CEO to express his concerns about his employment, and in particular regarding the earnout and bonus payments. Profit growth for the second fiscal year (ending May 31, 2000) was stagnant, and neither Hemphill nor Spectra received bonus or earnout payments.

Dissatisfied with defendant's actions in hiring Estes, the unfavorable DMC contract agreement in his region, and Estes' sales performance, Hemphill resigned from his position in April 2000. Thereafter, Hemphill commenced the instant lawsuit individually and on behalf of his former and current corporations, alleging that defendant breached the implied covenant of good faith and fair dealing with regard to the Earnout and Employment Agreements. Specifically, Count I of plaintiffs' complaint alleges that defendant's breach negatively impacted Spectra's earnout payment due for the first and second fiscal years of the contract agreement. Count I further alleges that defendant exercised its business discretion arbitrarily, capriciously, and in a manner inconsistent with the reasonable expectations of the parties under the Earnout Agreement. Count II alleges that defendant breached the Earnout Agreement by manifesting a positive and unequivocal intention not to comply with the implied covenant of good faith and fair dealing regarding its third fiscal year earnout payment to Spectra. Count III alleges that defendant's conduct negatively impacted Hemphill's bonus payment during the first and second fiscal years. Defendant now moves to dismiss or, in the alternative, to stay the instant

proceedings and compel arbitration based on the dispute resolution clauses contained in its written contracts with plaintiffs.

## DISCUSSION

The instant motion requires the Court to determine whether the allegations in plaintiffs' complaint fall under the dispute resolution provisions of the various agreements between the parties. If plaintiffs' claims fall under these provisions, the court should order a stay and compel the parties to resolve the instant dispute through arbitration.

The standard applied in deciding whether to compel arbitration is based on the Federal Arbitration Act ("FAA"), which provides that an arbitration clause in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. §2; see also 9 U.S.C. §§3-4 (requiring the court to stay proceedings if an issue before it is subject to arbitration under a valid written agreement between the parties).[3]

The Supreme Court's interpretation of the policy underlying the FAA establishes that "any doubts concerning the scope of abitrable issues should be resolved in favor of arbitration." Moses H. Cohen Memorial Hospital v. Mecury Construction Corp., 460 U.S. 1, 24-5 (1983); see also Goldberg, et. al. v. Focus Affiliates, Inc., 2001 U.S. Dist. LEXIS 7806 at *3, 2001 WL 649556 at *1 (N.D. Ill. June 8, 2001) (noting that federal law favors arbitration as a means of settling disputes). Thus, once it is clear that the parties have a contract that provides for arbitration of the contested issues between them, the arbitration provisions must be given their broadest meaning. Miller v. Flume, 139 F.3d 1130, 1136 (7th Cir. 1998). In deciding whether a

---

[3] There is no dispute in the instant case that the agreements between the parties are valid and enforceable.

6

particular claim comes within the scope of an arbitration agreement, the focus is on the factual allegations of the complaint. Schacht v. Hartford Fire Insurance Co., 1991 U.S. Dist. LEXIS 12145 at *6, 1991 WL 171377 *2 (N.D.Ill. 1991).

Defendant argues that each of plaintiffs' claims in the instant suit fall under the dispute resolution provisions of the agreements between the parties. Plaintiffs naturally disagree. The court will address plaintiffs' argument with respect to each count in turn, beginning with Count II.

I. **Count II: Breach of Earnout Agreement/Anticipatory Repudiation (Spectra v. MMS)**

In Count II, plaintiff alleges that defendant failed to deliver to plaintiff a payment schedule setting forth the earnout payment amount owed for the third fiscal year (ending May 31, 2001) within forty-five days of calculating that amount as required by the Earnout Agreement. Thus, plaintiff concludes, defendant breached the Earnout Agreement by manifesting an intention not to comply with the implied covenant of good faith and fair dealing in that agreement. Defendant argues that Section 11 of the Asset Agreement governs plaintiffs' claim in Count II. Plaintiff disagrees, arguing that "the conduct described in [Count II of] the lawsuit does not relate in any way to the Asset Agreement, which would indeed trigger the dispute resolution[s] clause." Instead, plaintiff argues, defendant's conduct relating to Count II "occurred well after the execution of the Asset Agreement," it involves "defendant's alleged failure to act in good faith with respect to payments owed," and therefore Section 11 of the Asset Agreement is inapplicable. The court agrees with defendant.

To begin, it is irrelevant that defendant's complained of conduct in Count II occurred after the execution of the Asset Agreement. As explained above, the Asset Agreement

7

incorporates the Earnout and Employment Agreements. What is relevant is the fact that Section 2 of the Earnout Agreement governs disputes about the amount of the earnout payment and, as plaintiffs' own argument makes clear, Count II involves "defendant's alleged failure to act in good faith with respect to payments owed" under that agreement. Surely, if plaintiffs are correct that they are owed money under the Earnout Agreement, then Count II involves a dispute as to the amount of the earnout payments.

Thus, plaintiffs' allegations fall under Section 2 of the Earnout Agreement, which, in turn, directs the parties to Section 11 of the Asset Agreement. Section 11.1 of the Asset Agreement defines a "dispute" as including, "any . . . matter relating in any way to this Agreement," and Section 11.2 requires that all disputes be submitted to binding arbitration for resolution. Thus, plaintiffs' allegations in Count II are subject to binding arbitration. Accordingly, defendant's motion to stay the instant case and compel arbitration is granted with respect to Count II.

## II. Counts I and III: Breach of the Implied Covenant of Good Faith Regarding Earnout and Bonus Payments (Double Sunrise v. MMS, Hemphill v. MMS)

In both Counts I and III, plaintiffs' allegations that defendant committed a breach of good faith and fair dealing claims are based on defendant's specific conduct of: failing to recruit and/or hire an adequate DBD to assist Hemphill in his region; failing to respond to Hemphill's requests that he be given sales support necessary to grow profit in his geographic region and achieve earnout payments for Spectra for the first and second fiscal years; and failing to adhere to Hemphill's advice not to enter into the unfavorable DMC contract.

8

Defendant argues that Section 11 of the Asset Agreement governs plaintiffs' claims in Counts I and III. Plaintiffs argue that the disputes in Counts I and III deal with defendant's conduct (which diminished payments owed under the Employment and Earnout Agreements) after the execution of, and not relating to, the Asset Agreement. Plaintiffs also argue that Sections 2 and 6, the dispute resolution clauses in the Earnout and Employment Agreements, pertain to disputes about the calculation of the amounts of the earnout and bonus payments only. Plaintiffs assert that they "make no allegations that defendant improperly calculated the amount of the earnout and bonus payment that were due." Thus, plaintiffs conclude, Counts I and III should not be stayed because defendant is not being sued for an improper calculation of the earnout and bonus payment amounts.[4] Once again, the court disagrees.

Plaintiffs' suggested interpretations of Section 2 of the Earnout Agreement and Section 6 of the Employment Agreements simply defy logic. The Earnout and Employment Agreements clearly set forth the formula for calculating the earnout and bonus payments to be made to Spectra and Hemphill each year. Given this, the only way that a dispute could arise regarding the calculation of those payments is if defendant's mathematical computation were incorrect. Clearly the parties did not include Sections 2 and 6 of the Earnout and Employment Agreements

---

[4] Plaintiffs' incorrectly rely on three district court cases from other jurisdictions for the proposition that their claims fall outside the scope of arbitration claim. T.R. McClure & Co., Inc. v. TMG Acquisition Co., 1999 WL 692683 (E.D. Pa. Sept 7, 1999); Blutt v. Integrated Health Services, Inc., 1996 WL 389292 (S.D.N.Y. July 11, 1996); Powderly v. Metrabyte Corp., 866 F.Supp. 39, (D. Mass. 1994). All three cases contain arbitration provisions limited only to objections based on the "mathematical determination" or calculation of the amount of payments to a party of the agreement. Further, in each of those cases, the respective courts noted that the parties were careful to limit the scope of their dispute resolution provisions in the agreements between the parties. The facts of the instant case are different in that Section 11.1 of the Asset Agreement makes clear that "any. . . matter relating in any way to this Agreement" shall be submitted to binding arbitration for resolution. None of the cases cited by plaintiffs contain a dispute resolution provision requiring that all disputes which "relate in any way" to the agreement be subject to arbitration. It is clear in this case that the parties did not intend to limit the dispute resolution provisions solely to the calculation of the payment amounts.

9

on the off-chance that defendant (a national corporation which no doubt employs hundreds of individuals educated beyond the fourth grade) would fail to add, subtract, multiply, and/or divide properly in calculating the earnout and bonus payments. Hence, the court concludes that, indeed, Sections 2 and 6 of the Earnout and Employment Agreements are intended to address situations where, as here, the parties disagree as to the *amounts* of the respective payments, and not merely the *calculation* of those amounts.

As explained above, Section 2 of the Earnout Agreement provides that "if the parties disagree as to the amount...the dispute shall be subject to resolution as set forth in the Asset Agreement." Thus, plaintiffs' claim in Count I that defendant "directly" and "negatively impacted the earnout payment" is clearly covered by Section 2 of the Earnout Agreement. Moreover, as with Count II, plaintiffs' allegations in Count I clearly fall within the definition of a "dispute" under Section 11.1 of the Asset Agreement, making Section 11.2 applicable once again. Thus, plaintiff must submit the allegations in Count I to binding arbitration.

The same goes for Count III. Section 6 of the Employment Agreement, which states that disputes relating to the amount of Hemphill's bonus are subject to resolution as set forth in Section 11 of the Asset Agreement, clearly applies to plaintiffs' claim that defendant's actions "directly" and "negatively impacted Hemphill's bonus payment." Thus, the court again looks to Section 11 of the Asset Agreement and, as explained above, concludes that plaintiffs' allegations in Count III must be arbitrated.

## CONCLUSION

For the foregoing reasons, the court grants defendant's motion to stay the instant proceedings and compel arbitration. Defendant's 12(b)(1) motion to dismiss is denied. See

10

Kroll v. Doctor's Associates, 3 F.3d 1167, 1172 (7th Cir. 1993). A status hearing is set for January 15, 2002, at 9:00 a.m.

**ENTER:** **July 25, 2001**

_____
**Robert W. Gettleman**
**United States District Judge**